Morning, may it please the court and counsel, my name is John Breslow and I represent the appellant and plaintiff Flagstone Development and Lawrence Heath. This is a diversity action that arose out of the sale of a real property in Montana. The basis of the case was a written contract. There are other defendants and other claims, but on summary judgment what the trial court grabbed onto was this notion that the underlying contract had been abandoned and also that the damages were too speculative. Those are the two issues that I want to tackle in my opening. I would like to reserve three minutes. I guess that's sort of where I would focus also and in terms of that the question is it doesn't seem like you have a very strong case, but then the question is was it, you know, did the judge just say this dog don't hunt and put it down a little bit early. And so there seemed to be, the judge seemed to focus on that email that your client sent to investors saying, you know, it's done, it's over. And your client countered that with, well, I was just, you know, I was just saying that, but I didn't have any intention to abandon it. But does Flagstone at any point inform RMT of any other avenues of funding Flagstone had available to it should the funding from DFC fall through? Yes, and those are the investors that we're referring to. My client had funding. In fact, his obligation to provide funding hadn't even been triggered yet because the obligations of the seller hadn't been satisfied with respect to getting the plat approved. So his obligations to fund the transactions had not even arisen at this time. And I do want to focus on those emails because if you read those emails closely, what they talk about is I'm going to be able to extricate myself from this transaction, and I'm going to be able to come out of this transaction with my escrow money repaid. And what he's being referred to there. I'm not sure he said I'm going to be able to. It was a little stronger than that, although I'm not sure this kills your client. He says I am in the process of. And that's what I wanted to talk about. It's a statement I am in the process of doing. But what that process was were settlement negotiations, and that's where we're being prejudiced. In my brief, what I argued was that Rule 408 and the concept of mitigation of damages are what's taking place during this time period. He says I'm in the process of having my escrow money refunded to me. That was no provision in the contract that provided that. He was doing that by way of separate settlement negotiations. So now what I find myself in is arguing with one hand behind my back in that I'm stuck with these emails, but I don't have all of the settlement negotiations that were going on at the time. And the court then grabs on to the email without the context of the email. And let's remember, when all of this was going down, they're issuing a termination letter on a pretext, a phony baloney explanation as to why the contract is being terminated. They're writing contracts that say this is all subject to release of the Heath contract. They're doing all this right up until the time of the sale to the new buyer. They are acknowledging that the contract is in existence. There is no abandonment of the contract. They're operating throughout this entire transaction as if there's a real live contract, which there was. It was only after the fact in discovery that they find this email. At the end of January 28th of 2008, was there any objective reason to believe that the contract could actually be performed? Because there were problems of potable water, you know, the prices had gone up, all of those things. Absolutely. And it's the McGill letter. I mean, the irony of this is that both sides rely on the same evidence. And in the ---- But what is the evidence that could be performed? The McGill letter that says if you adhere to the terms of the contract that you're obligated to, we will perform. I mean, that's what that letter is saying. Then there's an if-then proposition. If you insist on doing the things that you're doing that are causing interference with this contract and slowing your performance, then we will require A, B, C, and D. And what the trial court did is it ignored the if and it quoted from the then saying, you know, the contract can't be performed unless A, B, C, and D occur, and as a result the original contract had been abandoned. But he's selectively quoting from that letter. All of the testimony is consistent from Mr. Heath's deposition. I could have performed this contract as written. The McGill letter. If you perform under the terms of the contract, this deal will go forward. However, if you wish to continue doing the things that you're doing, we're going to require A, B, C, and D. Okay. Let's suppose you have a fact issue about whether the contract was abandoned or rescinded or something like that. The judge also granted partial summary judgment on damages, didn't he? Right. What's the ---- that was American titles motion? Right. And other defendants affected by that motion as well? Yeah. Everyone was affected by that motion. What's the story on that? Well, if you look at the case law and you look at the evidence that we had in this case, there is no case in Montana that's decided that had more evidence of the damages that we had in this case. We had a pro forma that was done by a CPA that arose out of the underlying transaction. That's Graboi? Is that his name?   He was the expert. This is Cheryl Sackrey. She's my client's CPA who prepares the pro forma that is being used to raise the money. In addition to that pro forma, we have their pro forma, because they were also considering developing the same piece of property, and they used the same set of assumptions that my client used. So we have both sides basically agreeing on the underlying financials. Then in addition to that, we have a land planner who's testified that this was a feasible project, that the issues like the water and the roads were not deal breakers or would have caused any problem. We had an affidavit from the sales team saying that this was a no-brainer and this was going to be a successful project. And on top of that, we had Graboi, who was the expert, who the Court excluded on the basis of Daubert. But my position is forget Graboi. With the evidence that's left over, we still have way more evidence than any other Montana case has ever relied upon in finding damages. And so I think it's important to understand that the judge has used two pro formas, both one by the plaintiff and one by the defense, expert testimonious to the viability of the project, a CPA who prepared the underlying pro forma, et cetera. So the judge discussed these pro formas that you're referring to? I don't believe he did. He laughed. Focused on Graboi.  Right. I mean, the fact, and again, the fact that it's not just that they had a pro forma. Instead, it uses the same set of assumptions with respect to profitability. I think their profitability number came out to $10 million. Ours came out to $17 million. The only difference was the size of the project. They were going to develop 1,900 lots or something like that, or 1,900 acres, and we were going to develop a different number. Now, it's probably in the record, and I just didn't see it. Is it in the record what the selling price was to the new buyer? Yes. Yeah. In that contract. I believe that contract is in the record. I can't cite to it. Including the selling price? I believe it includes the selling price. And is the selling price to the new buyer in any way relevant to what the damages might be? Possibly. It was not the same parcel. I think it was a slightly different configuration of lots. I have to say, I'm quite sympathetic to what Judge Siebel did with respect to your so-called expert. There just wasn't much there. Those looked like pie-in-the-sky numbers to me. And, frankly, I doubt he'd even be called at trial. I would ask the Court to consider the additional evidence, which is sufficiently more than the Delaney case that talked about the use of a pro forma in a real estate development case. In that case, there was one pro forma. It was the same type of development where it was a change in use of the property, and it found that that was sufficient. Correct me if I'm wrong. If we were to hold, for example, that the district judge prematurely granted summary judgment on the issue of abandonment, and if we were then to hold that there's no summary judgment with respect to whether the contract was abandoned and it may go forward then as a breach of contract action, you would have an opportunity to produce better damage numbers, correct? Yeah. As I look at the record, the damage numbers you have, I'm a little reluctant to rely on them. Well, let me ask you this, though. I would just assume for sake of argument and just at this point that if that issue was, if that was premature, but you've got a whole bunch of other people pulled in here that seem to have different situations. For example, you've got, there's a defamation claim that the Court ruled that there were merely expressions of opinion and cited a Montana case, and that's against DFC. You've got a summary judgment in favor of Usin and Correll on tortious interference, and so you could assume that the agreement was valid, but there's no evidence that Correll or Usin knew of its validity or that they acted purposely to induce the damage. Then you've got summary judgment in favor of AT&E on civil conspiracy, and it looks like, I mean, an argument could be made in the record that it's, that AT&E operated narrowly within the confines of the escrow terms contained in the agreement and took no overt act in furtherance of any conspiracy. Then you've got summary judgment on, in favor of Usin on the claim of civil conspiracy, because Usin was acting as the agent of Powers, and if summary judgment against Usin is not valid, then you've got all of these other summary judgments that I'm, you know, I think we have to look at separately, and I'm seeing those as being problematic. Well, and just because it appears complicated, let's not throw the baby out with the bat. I spent a lot of time on it. I'm not disagreeing with you that it's not complicated, but I'm not saying that just because if there's a triable issue on whether you abandon, that doesn't mean that the others, that the other summary judgments fall. Fair enough. But let's consider what those other summary judgments are. Two of them are against the brokers that were engaged in the new transaction, and the sales contract in there said subject to release of a Heath contract. Everybody knew there was a Heath contract, but they all ignored it. And under Montana law, you cannot induce a buyer to breach an existing contract. So that's simple. And that takes the – So what did they do, though? What are the undisputed facts on that point? Did, you know, didn't they check and say, you know, what's the status? Or, you know, you've got escrow people that you're trying to hold in, and it seems to me they just have a duty to follow the escrow agreements. And if they check with someone and, you know, you're like putting on them that they somehow have to be like the Ninth Circuit to ascertain whether there's a material attributable issue of fact, whereas if they talk to their lawyer and get assurance on that. So you're trying to bring the whole kitchen sink in here. Well, okay. Let's talk about the title company, because it really is a simple set of facts. They were asked to keep this transaction a secret, and they agreed to keep it a secret. Who was their relationship with? It was with my client. They were holding $100,000 of his money, and they were doling that money out in connection with the development of the property, which they now secretly have under escrow with someone else. So while they're a fiduciary to my client spending his money, they're over here saying we're going to keep secret this transaction and sell the property out from under you when we have a copy of your contract, and we're doling out the money in accordance with his terms. And number one, that's simple negligence. Number two, it's a breach of fiduciary duty. And three, it interfered with the contract that he had. So, and frankly. Typically, inducing breach of contract or interference with respective advantage, those lawsuits are typically against the person who signs the new contract rather than those who are somehow the almost ministerial facilitators of this. I mean, I've never seen an inducing breach of contract case in which the escrow holder is made a defendant on that theory. And perhaps the most viable claims are the breach of fiduciary duty and the negligence claim against the title company. Those clearly are valid. And the claims that we have for interference with contract are against the parties to that new contract that breached the old contract. So I think when you look at what the Court did, it really boiled this down to those two issues. And once it found this alleged abandonment, which it concedes is a factual question but plows through anyway because it apparently didn't like this e-mail, once it reaches those two decisions, then everything else just sort of fell by the wayside. I see you're down to about a minute and 20, and I know you wanted to reserve some time. Thank you. Thank you, Mr. Bressler. Let me ask counsel for the appellees if they've worked out a narration of how you're going to divide your time. Yes, Your Honors. We are going to take our lead from the group that was here before us. That is I am Mark Parker, and I will be taking the lead argument on what will be the principal argument, of course, whether the contract was abandoned. With me are Michael Bagley for American Title and Escrow, and Jen Smith, Lynn Grant for John Euston and U-Bar-S, David Charles for Development Finance Corporation, and Candace Payne for Jake Correll and Landmark. Well, from my perspective, the thorniest is on the abandonment of contract issue, and the question is maybe since you're representing all these other people, if we'll go and discuss the thorniest issue, but if we disagree with you on that and feel that there's a triable issue on abandonment, what does that do to all these other people? Do they necessarily get drug in with RMT, I guess it would be? No. We're the cheese that stands alone, and I'm sure that they would endorse that argument. In fact, Justin Joyner and Wayne Joyner are out because they were never signatories to the contract, and they were only representatives. The only person left that I represent would be Rocky Mountain Timberlands because they're the only signatory to the buy-sell, and the only issue reserved for appeal with respect to my three clients would be the contract issue. All the others are still gone because how could... Just so that, because I always worry about the people that you take their time and that nothing gets said on that. Why don't you give me a brief on each one of them, why you think they're out, and then come back to the thornier issue. You're asking me to speak for them, and I don't know how they would be as pleased with that, but I will be happy to. The fact of the matter is... You said you were speaking for everyone. I was speaking for everyone, Your Honor, on the rescission issue, but I'll go to the other ones. The real estate agents are out for the clear, but they were just doing the biddings of their principal, and they did not wander a bit from what they had been asked to do by their principal. So if their principals are responsible, that's one thing, but as agents, they never did anything other than the pure agency responsibilities they had. Boom, they're out. American Title and Escrow, not only did it fail to disclose, it did fail to disclose the second transaction to Mr. Heath, but the instructions were that the second one closes only if the first one doesn't, and the first one didn't. In fact, there is no claim right now alive anywhere in the world for specific performance of that first escrow. Let's get that in our minds. There is no evidence that Mr. Heath was capable of performing this contract. The court so found, and for the first time today, we hear that he was really a ready and willing and able buyer. The issue of specific performance is out the window because now the list pendants has even been removed. It's mooted. So the ship has sailed on that first escrow and whether it could ever be closed. The only issue was there any damages, and so American Title and Escrow is out because it closed the second escrow and returned the escrow money, and that's why the stipulation is in the record. The only thing about American Title and Escrow that it had was the escrow money. It returned it, Document 76. Developer Finance, it is a completely different breed of cat. It was never party to any contract and never interfered with any contract. It simply did not finance this deal. So they're all out. Well, the district court, I believe, said it was a golf game and there were opinions that were stated under, what, Montana law? Right. Is that McConkel? Somebody allegedly said to somebody that Mr. Heath was the laughingstock of this operation. That's not actually under Montana law or the law of any of the 50 states, I would imagine. So they're all out. Justin Joyner is out. Wayne is out. Rocky Mountain Timberlands should be out because the contract was abandoned. So what's your evidence of abandonment? I'm not entirely convinced that this contract was abandoned. The pleadings. We start out with the pleadings. Mr. Heath said that it was abandoned. He said in the complaint, he said because of numerous issues outlined above, the parties agreed in early 2008 to revise yet again the bisel agreement. That is... Revise is not the same word as abandon. Well, and then it went on to say, moreover, and this is the complaint paragraph 31, paragraph 27 in the complaint, moreover, the plaintiffs have alleged that access to plaintiff's capital was fatally affected. That was in the complaint. Our access to capital is fatally affected. And then you go on. So the complaint said the deal was done. We were looking for a new one, a completely revised deal. If the pleadings are insufficient... Can you read that paragraph about access to capital again? I'm sorry. I need to hear it again. The complaint said, the complaint said was specific. Moreover, the plaintiffs have alleged, they said in the complaint, access to capital was fatally affected. That's the second amended complaint, the one we were under, paragraph 27 and docket entry 37. And they said in the paragraph 31, because of the numerous issues outlined above, and in the complaint, those were water, roads, the other issues, the parties agreed in early 2008 to revise yet again the buy-sell. And so if the pleadings don't plead, Mr. Heath, plead flags don't have... When he's saying that they agreed to revise, I think that he's getting at, there's sort of two arguments. There's the abandonment and there's the impossibility, and they're sort of intertwined. But on the abandonment, it would have obviously been cleaner if, you know, why shouldn't we read Montana law requiring RMT to just give Flagstone notice that it considered Flagstone to have abandoned the contract and give Flagstone an opportunity to cure? And then if we, and so if that hadn't happened, then clearly you're done. But you have this, you know, I mean, if we have to give them all inferences, if we have to give Flagstone all inferences, there is this other escrow that's going on that they don't know about. And so if it was really so on the up and up, why did it have to be secret if it was truly abandoned as far as that goes? That's my, I have an answer for that. All right. And it is as clear as day. And it's in the record, and it's document 216-3 in the court below, and the excerpt's a record, I don't have it before me, but it's a letter that Mr. Breslow just referred to. It's the letter from Greg G. McGill of January 31, 2008. And in the real estate world, what Mr. McGill, on behalf of Flagstone, was saying was as clear as a bell. He says in paragraph, and he says on the third page of the letter, he says Mr. Heath can also tie up in, can tie the property up in court and litigate the terms of the contract. I'm sorry, I'm on page three, so where are you? Page three, second, the first full paragraph, the second paragraph. You go down, Your Honor, and it says, it's about the fifth line, it says right after the word shellhammers, Mr. Heath can also tie the property up in court and litigate the terms of the contract. Yeah, so? And so if you are Mr. Joiner, and you have a $70,000 a month interest expense, and you know title companies shy away from Liz Pendence, this was, we're going to tie that property up in court, we know that you're facing $70,000 a month in interest, and we don't want to enforce the terms of the contract, we want the court to litigate the terms of the contract. Well, that's your interpretation of it, and he could give another interpretation, so why doesn't that make it a triable issue? And maybe your interpretation is better. No, because we're going to go to Mr. Heath's interpretation. Okay. Mr. Heath's interpretation in his own, in his deposition, so we have he has pled with the contracts over, he has admitted to others the contract is owed over, and he's actually ---- When does he plead the contracts over? I still don't get that. Oh, well, when he says that his access was fatally affected, and they had to completely redo the buy-sell. You only completely redo a buy-sell if you agree that the first, why do we do something you want to enforce? Well, but I'm not sure that I totally understand that, and I'm looking at the first paragraph of this same letter. If we do not have that meeting, I will issue a cease-and-desist RMT demanding that I stop all further proceedings on behalf of the developer of Flagstone, turn over all the records on this project, and allow Flagstaff to finish its project. That sounds as though what he wants is, listen, if you don't start behaving, I'm going to make you behave, and I'm going to finish the project. That seems to me quite the opposite of evidence that he's abandoned. Well, they, okay, let's go to my third point. I mean, when you read, in my mind, you read this in conjunction with the other memo saying we're extricating ourselves, we're getting our money back. But when you ask Mr. Heath, when I asked him his deposition, and it's in my, I said there was no promise by Rocky Mountain that each lot would have an economically developable water source. Is that a fair statement? Answer, yes. But you had the right to say no, I don't want this property because I have discovered during the due diligence period that there's not an economically developable water source. Answer, yes. And during the due diligence period, you discovered that each lot would not have an economically developable water source. Fair statement? He said yes. So what follows from that? Excuse me? So what follows from that? What follows from that is that he, Mr. Heath, knew and admitted that it was an uneconomical project. That's what he said. He said I had a right to back out if there wasn't water access. And then he told others that I am backing out. But he didn't say he had backed out. And then he tells in the pleadings, he says he's going to back out. And then in his deposition, in my mind, he told me that he backed out. No, as I read that, he said he had the right to back out. Okay, but in the deposition, he told me he backed out. So where do you say that? I will find in 272, it's quoted in Judge Siebel's order. And so don't you also have one unanswered proposed revision request? Oh, yes. Well, but I mean, doesn't that, I mean, isn't one inference of that is that negotiations were still ongoing? Negotiations for a fourth contract were ongoing because the third contract was abandoned. Let me ask you this, and this is a small point in the whole overall scheme of things, but I'm not clear why the Grabois Declaration was disallowed. It sounds like the judge weighed it and ruled on its weight rather than its admissibility. Why wasn't this guy allowed to express his opinion on what the profits would have been? He just took it straight. They weren't his numbers. He took it straight from the… So what? I mean, why can't he rely on the numbers that are given to him and do whatever he does with it? I've eaten up about all my colleagues' time. Could I have Mr. Bagley address that? That was the question he was designed to… You've got a couple and a half minutes left. We'll turn it over to whoever knows the answer to that one. Thank you. May it please the Court, Counsel. Mr. Bagley, is that right? Bagley? Yes, Your Honor. Just to clarify a couple points, and I know that this is kind of Byzantine in terms of all the issues going all over the place, but I believe my colleague, I will answer your question, would you like me to do that now or clarify something before? The reason why Dale Graboy's report was properly excluded is because of the… There's case law in the state of Montana, Sven's Rude, and the Malloy decision, Northwood, that says you cannot have lost profit damages because they're speculative. In this decision, and based on your question, Your Honor, it was properly excluded because it parroted every single second calculation that Mr. Heath or Flagstone already did with respect to this property in a prospectus. Why can't experts in that field rely on information in the prospectus to render an opinion? Because if in the court of law they have to also follow Daubert, Rule 702, and actually have independent methodology in place so that someone can independently verify those numbers, it's a distinction between having to go through a prospectus and ask for investment capital when you're actually, in this case, going to be asking a jury to award $17 million based on an ethereal concept that no one else can come up with. And particularly under the circumstances of this case, I was… Well, it's abuse of discretion review, right? I think it's DeNovo. You think it's DeNovo? I'm not entirely sure of that, Justice Callahan. For the appeal of Daubert? Abuse of discretion. Okay, abuse of discretion. I'll take that. I mean, DeNovo isn't so good for you. Well, it's a summary. The summary. Well, you know, the summary judgment… What did your boy actually do? He said, I take some numbers from a prospectus and then I… What he did is he cut and pasted every single calculation… Like what? …in one page. Give me an example of one. Future costs that might be attributable to it, marketing figures, and lots. Why can't this guy say, I'm going to assume these costs, I take them from the prospectus, and then you can throw darts at it, you can attack it, but why can't he say, based on that assumption, this is what I project? According to Loy and Northwood, yes, I do understand your question, and I believe that the lost profit analysis fails and why it's speculative on its face, not to mention there's a technical argument why Grab Boys should not be considered in this court because he didn't appeal the exclusion of that expert. Well, I think I can answer that question better than you're answering it, and that's not good. But I think that what Judge Silverman is pointing out is experts oftentimes rely on other people's calculations, and they're allowed to do that because they're experts, but they have to give the court some confidence that the court knows that they've reviewed certain things, that they've looked certain things and said, well, they used this mechanism and this is what I would do or whatever, and what the judge here said was none of that really came on. You just put this talking head on, and you took these other ones and somehow said now it's going to be expert opinion even though. But I'm not sure that this expert, if he drilled down a little more, couldn't do exactly what Judge Silverman is saying. I respectfully disagree, Your Honor, because I think that in terms of presenting a lost profit analysis, I think the linchpin of his entire framework of analysis would be finding some comparable real estate development in Montana. Well, then that makes him not a very good expert, you know, but I'm not sure why it's inadmissible. I understand why you might not find it credible compared to some other expert, but I don't see why you would say it doesn't even come in. Our position is it's speculative, hopelessly speculative on all levels, based on the fact that there's no credible methodology in place. He never did any of the number calculations himself. There's an error in the exact calculations with respect to positing what Mr. Heath said this development's going to cost, not to mention the economic reality that Lehman Brothers. It goes to its admissibility, not to its weight. It's absolutely to its admissibility. Okay. I see you're out of time for you folks, so let me turn the floor back over to Mr. Breslau. Thank you very much, Mr. Begley. We've got about a minute left, Mr. Breslau. Thank you. Just very briefly on the Grabois issue, since I was the one that hired him, and what I asked him to do was review what Cheryl Sacre had done and tell me, is that a fair and reasonable pro forma calculation with respect to this project? And he went through all the analysis. He relied upon that report, and he said, yes, this is fair and reasonable. So I don't think there's any requirement that he come up with some new numbers. I mean, to do so would have implied that he disagreed with Ms. Sacre. But with respect to the abandonment issue, at least now the hubris is out in the open. What they're saying is we had to keep this a secret because Heath was going to try to enforce the terms of the written contract. And with respect to the other defendants, what makes this so problematic is he may have been able to ‑‑ he could never have carried that out on his own. He had to enlist the title company to assist him in keeping it a secret. He had to enlist the brokers that were involved in keeping it a secret. They knew what release of the Heath contract meant. It means get a release, meaning get a signature. And everybody abandoned that requirement. Why? Because they wanted the money. And that orchestration that could not have taken place by Mr. Joyner alone or RMT alone was done with the acknowledgment of the title company. Please keep this a secret. Yes, we'll keep it a secret. And now we know why. Because they knew he was going to seek to enforce the terms of the written agreement. Great. Thank you, Mr. Purcell. Thank you. Ladies and gentlemen, we'll stand for assessment.
judges: Silverman, Fletcher, Callahan